**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SONYA RENEE; CANDICE JOHNSON, a
minor, by Sonya Renee, her
guardian ad litem; MARIBEL
HEREDIA; JOSE ALDANA, a minor,
by Maribel Heredia, his guardian
ad litem; B. DOE, a minor, by N.
Doe, her guardian ad litem;
MARIEL RUBIO; DANIELLE RUBIO, a
minor, by Mariel Rubio, her
guardian ad litem; STEPHANIE
RUBIO, a minor, by Mariel Rubio,
her guardian ad litem; GUADALUPE
GONZALEZ; DAISY GONZALEZ, a
minor, by Guadalupe Gonzalez,
her guardian ad litem; JAZMINE
JOHNSON, a minor, by Deanna
Bolden, her guardian ad litem;
ADRIANA RAMIREZ, a minor, by
Arcelia Trinidad Ramirez, her
guardian ad litem; JANE DOE, a
minor, by John Doe, her guardian
ad litem; CALIFORNIANS FOR JUSTICE
EDUCATION FUND; CALIFORNIA
ASSOCIATION OF COMMUNITY
ORGANIZATIONS FOR REFORM NOW,
              *Plaintiffs-Appellants,*
                 v.
ARNE DUNCAN, in his official
capacity; UNITED STATES
DEPARTMENT OF EDUCATION,
              *Defendants-Appellees.*

No. 08-16661

D.C. No.
3:07-CV-04299-PJH

ORDER AND
OPINION

16317

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
February 11, 2009—Stanford, California

Filed September 27, 2010

Before: Dorothy W. Nelson, William A. Fletcher and
Richard C. Tallman, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge Tallman

## COUNSEL

John T. Affeldt and Tara Kini, Public Advocates, Inc., San Francisco, California, for the plaintiffs-appellants.

Alisa B. Klein, United States Department of Justice, Civil Division, Washington, D.C., for the defendant-appellee.

Lisa A. Davis, Wilson Sonsini Goodrich & Rosati P.C., Palo Alto, California, for The National Coalition of ESEA Title I Parents, Inc., et al., as amicus curiae.

Donald B. Verilli, Jr., Jenner & Block LLP, Washington, D.C., for Teach for America, et al., as amicus curiae.

## ORDER

This court's opinion filed July 23, 2009, and reported at 573 F.3d 903, is withdrawn and is replaced by the attached Opinion and Dissent.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc, filed August 25, 2009, is DENIED.

---

## OPINION

W. FLETCHER, Circuit Judge:

Appellants Sonya Renee, et al., appeal the district court's order granting summary judgment in favor of Appellees U.S. Department of Education and Arne Duncan, Secretary of Education[1] (collectively, "the Secretary"). Appellants challenge a federal regulation permitting teachers who are participating in alternative-route teacher training programs, but have not yet obtained full State certification, to be characterized as "highly qualified teachers" under the No Child Left Behind Act. The district court granted summary judgment to the Secretary. We reverse and remand.

### I.   Background

#### A.   No Child Left Behind Act and the Challenged Regulation

The No Child Left Behind Act ("NCLB") was enacted in 2002. Its overarching goal is "to ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments." 20 U.S.C. § 6301. NCLB seeks to

---

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Secretary Arne Duncan is automatically substituted for former Secretary of Education Margaret Spellings as Appellee in this case.

close the "achievement gap between high- and low-performing children, especially the achievement gaps between minority and nonminority students, and between disadvantaged children and their more advantaged peers." *Id.* § 6301(3).

Each state is responsible for ensuring compliance by its local school districts. *Id.* §§ 1232c, 7844(a). NCLB provides funds to states and schools under several sections, only one of which is central to this appeal. Specifically, Title I funds are used to supplement the educational needs of disadvantaged students. *Id.* §§ 6301 *et seq.* The Secretary has the authority to enforce NCLB. He may withhold funds or take other enforcement action if a state fails to comply substantially with NCLB's requirements. *Id.* § 1234c ("Whenever the Secretary has reason to believe that any recipient of funds under any applicable program is failing to comply substantially with any requirement of law applicable to such funds, the Secretary may . . . withhold further payments under that program as authorized by section 1234d of this title[.]").

A premise of NCLB is that good teachers — defined by Congress as "highly qualified" teachers — are crucial to educational success. NCLB provides that, by the end of the 2005-06 academic year, only "highly qualified" teachers should instruct core academic classes in school districts receiving Title I funding (the "100% requirement"). *Id.* § 6319(a)(2). "Core academic subjects" are "English, reading or language arts, mathematics, science, foreign languages, civics and government, economics, arts, history, and geography." *Id.* § 7801(11); 34 C.F.R. § 200.55(c).

NCLB requires that states and school districts develop and submit plans to meet the mandates of the statute. 20 U.S.C. §§ 6311(a)(1), 6311(b)(8)(C), 6319(a)(2) (state plans); *id.* §§ 6312(b)(1)(N), 6312(c)(1)(I), 6319(a)(3) (district plans). To receive funds under Title I of the statute, NCLB requires states to identify steps they will take to ensure that "poor and

minority children are not taught at higher rates than other children by inexperienced, unqualified, or out-of-field teachers." *Id.* § 6311(b)(8)(C).

NCLB also requires that states and school districts report annually on their progress toward meeting the 100% requirement. *Id.* §§ 6311(h)(1)(C)(viii), 6311(h)(2), 6319(b)(1). States must provide this information to the Secretary, *id.* §§ 6311(h)(4)(G), 6319(b)(1)(B), who must report nationwide statistics on "highly qualified teachers" to Congress, *id.* § 6311(h)(4)-(5). Schools receiving Title I funds must inform a parent when his or her child is taught for four or more weeks by a teacher who is not "highly qualified." *Id.* § 6311(h)(6)(B)(ii).

If a "State educational agency" fails to submit to the Secretary a "plan" satisfying the requirements of NCLB, *id.* § 6311(a)(1), the Secretary may withhold federal funds until the state has done so. *Id.* § 6311(g)(2) ("If a state fails to meet any of the requirements of this section, other than the requirements described in paragraph (1) [not at issue here], then the Secretary may withhold funds for State administration under this part until the Secretary determines that the State has fulfilled those requirements."); *id.* § 6311(b)(8)(C) ("Each State plan shall describe . . . the specific steps the State educational agency will take to ensure that both schoolwide programs and targeted assistance schools provide instruction by highly qualified instructional staff as required by sections 6314(b)(1)(C) and 6315(c)(1)(E).").

NCLB contains a lengthy definition of "highly qualified teacher." Of central concern in this litigation, "highly qualified" means that:

> the teacher *has obtained full State certification as a teacher (including certification obtained through alternative routes to certification)* or passed the State teacher licensing examination, and holds a license to

teach in such State, except that when used with respect to any teacher teaching in a public charter school, the term means that the teacher meets the requirements set forth in the State's public charter school law[.]

20 U.S.C. § 7801(23)(A)(i) (emphasis added).

On December 2, 2002, the Secretary promulgated regulations providing a more detailed definition of the statutory term "highly qualified teacher." 34 C.F.R. § 200.56. Section 200.56 provides, in pertinent part:

> [A] "highly qualified teacher" . . . meets the requirements in paragraph (a) [and other paragraphs not relevant to this appeal].
>
>> (a) In general.
>>
>>> (1) Except as provided in paragraph (a)(3) of this section [covering charter schools], a ["highly qualified"] teacher . . . must —
>>>
>>>> (i) *Have obtained full State certification as a teacher, which may include certification obtained through alternative routes to certification*; or
>>>>
>>>> (ii)(A) Have passed the State teacher licensing examination; and (B) Hold a license to teach in the State.
>>>
>>> (2) A teacher meets the requirement in paragraph (a)(1) of this section if the teacher —
>>>
>>>> (i) Has fulfilled the State's certification and licensure requirements appli-

cable to the years of experience the teacher possesses; or

(ii) *Is participating in an alternative route to certification program* under which —

    (A) The teacher —

        (1) Receives high-quality professional development . . . ;

        (2) Participates in a program of intensive supervision . . . ;

        (3) Assumes functions as a teacher only for a specified period of time not to exceed three years; and

        (4) *Demonstrates satisfactory progress toward full certification as prescribed by the State*[.]

*Id.* (emphasis added).

Neither NCLB nor the Secretary's regulation defines "alternative routes to certification." The traditional path to a teaching credential generally involves obtaining a degree and taking education courses. The term "alternative routes to certification" generally refers to non-traditional training programs that are typically designed for people who already hold at least a bachelor's degree in a field other than education. These alternative programs are often designed to address teacher shortages in specific subjects or geographic areas. *See*, *e.g.*, Cal. Educ. Code § 44382 ("Alternative certification programs shall address geographic and subject matter shortage areas, and shall be targeted toward people with work experi-

ence and others who already have a bachelor's degree in the field in which they plan to teach.").

Some aspects of the traditional route to teacher certification — such as formal course work in education philosophy or pedagogy — are typically shortened, or sometimes waived altogether, in alternative-route programs. Several well-known and successful alternative-route programs, such as Teach for America and Troops to Teachers, provide some training to participants before they begin teaching in the classroom. Teach for America participants, for example, receive training during the summer before they enter the classroom. Support and training typically continue for the length of an alternative-route program. After successful completion of an alternative-route program, a teacher receives a credential similar or identical to a credential obtained after successful completion of a traditional teacher-training program.

Appellants do not object to characterizing an alternative-route teacher who has already obtained "full State certification" as a "highly qualified teacher." *See* 20 U.S.C. § 7801(23)(A)(i) ("highly qualified teacher" includes an alternative-route teacher who "*has obtained* full State certification as a teacher") (emphasis added); 34 C.F.R. § 200.56(a)(1)(i) ("highly qualified teachers" include alternative-route teachers who "*have obtained* full State certification as a teacher") (emphasis added). However, Appellants do object to characterizing as a "highly qualified teacher" an alternative-route teacher who has not yet obtained full state certification, but who merely "*[d]emonstrates satisfactory progress toward* full certification[.]" 34 C.F.R. § 200.56(a)(2)(ii)(A)(4) (emphasis added). Appellants contend that such teachers are not "highly qualified" within the meaning of § 7801(23).

## B. California Law

Neither NCLB nor the Secretary's regulation defines the term "full State certification" contained in NCLB. The parties

agree that NCLB gives the states considerable flexibility in establishing credentialing systems under which a state teaching permit or credential may constitute "full State certification" within the meaning of NCLB. California law uses the terms "waiver," "permit," and "credential" to indicate various levels of teachers, and of certification, under state law. California has several levels of waivers, permits, and credentials, arranged in a rough hierarchy.

First, beginning at the bottom of the hierarchy, there are waivers. Individuals can teach pursuant to a waiver of the requirement for either a permit or credential. The Commission on Teacher Credentialing has authority to grant waivers in specified situations. Cal. Educ. Code § 44225(m).

Second, there are emergency permits, including an Emergency 30-day Substitute Teaching Permit, Cal. Code Regs. tit. 5, § 80025, and an Emergency Career Substitute Teaching Permit, *id.* § 80025.1. Emergency permits are valid for no more than one year and are restricted to the district that requested the issuance of the emergency permit. *Id.* § 80023.1. Teachers can renew emergency permits, but renewal ordinarily requires, among other things, demonstrated progress toward a non-emergency credential. *Id.* § 80026.6(a)(6).

Third, there are Short-Term Staff Permits and Provisional Internship Permits. Unlike emergency permits, which largely cover substitute teachers, these permits allow a teacher to serve as a teacher of record in an assigned classroom. *Id.* §§ 80021(e), 80021.1(e).

Fourth, there is an "intern credential." This is the first certification in the hierarchy that California characterizes as a "credential" rather than a "permit." An intern credential holder is participating in, but has not yet completed, an alternative-route teacher training program. *See* Cal. Educ. Code §§ 44830.3, 44259(b)(3)(C). Like Short-Term and Pro-

visional Internship permits, an intern credential allows the holder to serve as a teacher of record. *Id.* §§ 44325(a), 44326, 44830.3(a). California requires internship programs to provide "preservice training . . . tailored to the grade level or class to be taught." *Id.* § 44830.3(b)(3).

Fifth, there is a "preliminary credential." A preliminary credential may be obtained through either a traditional or an alternative-route teacher training program. *Id.* § 44259(b)(3). A preliminary credential is generally valid for five years. *Id.* § 44251(a)(2), (b)(2). The minimum requirements for a preliminary credential include a bachelor's degree, a passing score on the state's "basic skills examination," satisfactory completion of an accredited "program of professional preparation" (including traditional and alternative-route programs), and a passing score on one or more subject matter examinations or completion of an approved subject matter program. *Id.* § 44259(b).

Finally, at the top of the hierarchy, there is a "clear credential." *See id.* § 44259(c). To obtain a clear credential, an individual must have held a preliminary credential, have completed a "program of beginning teacher induction," and have gained experience in specified areas. *Id.* § 44259(c)(2), (4). Clear credentials are generally valid for life. *See id.* § 44251(a)(3), (b)(3).

In 2004, after the promulgation of the federal regulation challenged in this case, California promulgated regulations that piggybacked on the federal regulation. The California regulation applicable to middle and secondary schools provides that a teacher "meets NCLB requirements" if the teacher "[i]s currently enrolled in an approved intern program for less than three years *or* has a full credential." Cal. Code Regs. tit. 5, § 6110(2) (emphasis added). The regulation applicable to elementary schools provides the same thing, but omits the word "full" before "credential." *Id.* § 6101(2) ("[i]s currently enrolled in an approved intern program for less than

three years *or* has a credential") (emphasis added). By their use of the word "or," these regulations indicate that an intern teacher does not have a "(full) credential." That is, the California regulations provide the qualification criterion in the alternative: A teacher "meets NCLB requirements" if the teacher is "enrolled in an approved intern program" *or* if the teacher "has a (full) credential."

The 2004 California regulations mimic the federal regulation challenged in this case. As described in greater detail above, the federal regulation provides that a teacher may be considered fully certified, and thus "highly qualified," within the meaning of NCLB, if the teacher "[i]s participating in an alternative route to certification program" and "[d]emonstrates satisfactory progress toward full certification," *or* if the teacher "[h]as fulfilled the State's certification and licensure requirements applicable to the years of experience the teacher possesses." 34 C.F.R. § 200.56(a)(2). Mimicking the federal regulation, the California regulations provide that a teacher "meets NCLB requirements" if that teacher is "currently enrolled in an approved intern program for less than three years" *or* "has a (full) credential." Cal. Code Regs. tit. 5, §§ 6110(2), 6101(2).

Appellants contend that the challenged federal regulation, upon which the 2004 California regulations are based, allows a disproportionate number of interns to teach in minority and low-income schools in California, in violation of NCLB. Specifically, they contend that intern teachers in California do not have "full State certification" and are thus not "highly qualified teachers" within the meaning of NCLB. They contend that if the federal regulation is declared invalid, California will not be allowed to treat intern teachers as highly qualified teachers for purposes of NCLB. The result, Appellants contend, will be that California is likely to take steps to ensure that fewer intern teachers, and more teachers with "preliminary" and "clear" credentials, teach in minority and low-income public schools in California.

## II.   Prior Proceedings

Appellants brought suit in federal district court, alleging that 34 C.F.R. § 200.56(a) is invalid to the extent that it characterizes an alternative-route teacher who is still in the process of obtaining "full State certification" as a "highly qualified teacher." The challenged portion of the regulation is § 200.56(a)(2)(ii). Both parties moved for summary judgment. The district court granted summary judgment to the Secretary, upholding § 200.56(a)(2)(ii). Appellants timely appealed.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.   Standard of Review

We review de novo questions of justiciability under Article III. *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003). We also review de novo a district court's grant of summary judgment. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 941 n.17 (9th Cir. 2006). "Although we give deference to an agency's construction of a statutory provision it is charged with administering, we must reject those constructions that are contrary to clear congressional intent or that frustrate the policy Congress sought to implement." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002) (internal citation omitted).

## IV.   Discussion

## A.   Order of Analysis

The Secretary argues that Appellants do not have Article III standing. In a case where Article III justiciability is at issue, we usually begin our discussion with that question because Article III justiciability is a prerequisite to reaching the merits of the dispute. We conclude that Appellants have Article III standing, as discussed below. But we reverse the usual order of discussion because we think our discussion of the merits

will help the reader understand our discussion of Article III standing.

## B.    The Merits

The challenged federal regulation interprets a federal statute. The regulation was adopted by the responsible federal agency through notice and comment rulemaking. We therefore apply the analytical framework outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The first question is "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-843; *see also Pac. Nw. Generating Coop. v. Dep't of Energy*, 580 F.3d 792, 806 (9th Cir. 2009). If, however, we determine that Congress has not clearly spoken on the precise question, the second question is whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Because the intent of Congress, as expressed in the NCLB, is clear, we do not get beyond the first question.

NCLB provides that an alternative-route teacher is "highly qualified" once he or she has obtained "full State certification." The statutory text provides, in pertinent part:

The term "highly qualified" —

(A) when used with respect to any public elementary school or secondary school teacher teaching in a State, means that —

(i) the teacher *has obtained full State certification* as a teacher (including certification obtained through alternative routes to certification)[.]

20 U.S.C. § 7801(23) (emphasis added). NCLB does not define "full State certification," but it makes clear — whatever "full State certification" means — that such certification must have been obtained before a teacher can be characterized as "highly qualified."

The federal regulation, quoted at length above, begins by essentially repeating the statutory language. It provides that a "highly qualified teacher" "*must . . . have obtained* full State certification as a teacher, which may include certification obtained through alternative routes to certification." 34 C.F.R. § 200.56(a)(1)(i) (emphasis added). It then goes on, however, to provide that an alternative-route teacher is "highly qualified" even if he or she has *not* obtained "full State certification." It provides that a teacher "meets the requirements in paragraph (a)(1)" (which include the requirement that "full State certification" have already been obtained), if that teacher "[i]s participating in an alternative route to certification program" and "*[d]emonstrates satisfactory progress toward* full certification as prescribed by the State." *Id.* § 200.56(a)(2)(ii) (emphasis added).

The Secretary points out that the meaning of "full State certification" in NCLB is ambiguous because it depends to a substantial degree on state law. We agree that the meaning of "full State certification" in NCLB is ambiguous and that it substantially depends on state law. But this ambiguity is irrelevant.

**[1]** The "precise question at issue," *Chevron*, 467 U.S. at 842, is not the meaning of "full State certification" as used in NCLB. Rather, the "precise question at issue" is the difference between the meaning of "*has obtained*" full State certification in the statute, 20 U.S.C. § 7801(23), and the meaning of "*demonstrates satisfactory progress toward*" full State certification in the regulation, 34 C.F.R. § 200.56(a)(2)(ii). The difference between having obtained something and merely making satisfactory progress toward that thing is patent. We

conclude that the Secretary's regulation impermissibly expands the definition of "highly qualified teacher" contained in 20 U.S.C. § 7801(23) by including in that definition an alternative-route teacher who merely "demonstrates satisfactory progress toward" the requisite "full State certification."

**[2]** We therefore hold that 34 C.F.R. § 200.56(a)(2)(ii) is invalid because it is inconsistent with the "unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843. We emphasize that our holding is based on the difference between the meaning of "has obtained" in 20 U.S.C. § 7801(23) and the meaning of "demonstrat[es] satisfactory progress toward" in § 200.56(a)(2)(ii). Our holding is not based on the meaning of "full State certification" in § 7801(23).

## C.   Article III Standing

The Secretary did not argue in the district court that Appellants lack standing under Article III. He makes that argument for the first time on appeal. Lack of Article III standing is a non-waivable jurisdictional defect that may be raised at any time, even on appeal after failing to raise it in the district court. *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1085 (9th Cir. 2003). For the reasons that follow, we conclude that Appellants have Article III standing.

**[3]** "[T]he irreducible constitutional minimum of [Article III] standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1038 (9th Cir. 2006). "First, the plaintiff must have suffered an 'injury in fact' " that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. "Second, there must be a causal connection between the injury and the conduct complained of," such that the injury is fairly traceable to the action challenged. *Id.* "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." *Id.* at 561 (internal quotations omitted). We consider these three requirements in turn.

### 1. Injury in Fact

Appellants are California public school students, their parents, and two non-profit organizations, Californians for Justice ("CFJ") and California Association of Community Organizations for Reform Now ("California ACORN"). The named students, along with student members of the two organizations, attend California public schools at which significant numbers of intern credential holders serve as teachers. As a result, these students are being taught by interns, have been taught by interns, or are substantially likely to be taught by interns.

Appellants presented evidence in the district court that a disproportionate number of interns teach in California public schools that serve minority and low-income students. For example, forty-one percent of interns in California teach in the twenty-five percent of schools with the highest concentrations of minority students. In contrast, two percent of interns in California teach in the ten percent of schools with the lowest concentration of minority students. Interns are similarly concentrated in schools serving low-income communities, with sixty-two percent of interns teaching in the poorest half of California's schools. This disproportionate distribution of interns, Appellants contend, has resulted in a poorer quality education than Appellants would otherwise have received.

[4] We conclude that Appellants have established injury in fact. In adopting NCLB, Congress decided that teachers with "full State certification" are, in the aggregate, better teachers than those without such certification. We recognize that it is debatable whether Congress was correct in deciding that teachers with "full State certification" are in fact better than teachers without such certification. This is particularly debatable if intern teachers enrolled in programs such as Teach for

America do not have "full State certification." But that is not for us to decide. We are bound to accept Congress' determination that students taught by a disproportionate number of teachers without "full State certification" have been injured in fact.

## 2. Causation

**[5]** We also conclude that there is a causal connection between the promulgation of the federal regulation challenged in this case and the later promulgation of the California regulations. The parties do not dispute that the California regulations were adopted as a result of the challenged federal regulation. To the degree that the federal regulation, and the piggybacking California regulations, have had the effect of permitting California and its school districts to ignore the fact that a disproportionate number of interns teach in schools in minority and low-income areas, there is a causal connection between the challenged regulation and the injury of which Appellants complain.

## 3. Redressability

Finally, we conclude that Appellants' injury is likely to be redressed by the invalidation of the federal regulation. "Plaintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision." *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998). The plaintiffs' burden is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). They need only show that there would be a "change in legal status," and that a "practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). If an agency has misinterpreted the law, there is Article III standing "even though the agency . . . might later, in the exercise of its lawful discretion,

reach the same result for a different reason." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998).

**[6]** The challenged federal regulation permits a state to treat intern teachers as "highly qualified" under NCLB even if those teachers are not fully certified under state law but are only "demonstrat[ing] satisfactory progress toward full certification." The 2004 California regulations, piggybacking on the federal regulation, provide that fully credentialed teachers under California law, as well as teachers who are currently enrolled in an intern program, are "highly qualified" within the meaning of NCLB. But the California regulations do not change the definition of fully credentialed under California law. Thus, unless intern teachers have "full State certification" under some other California law, such teachers are not "highly qualified" for purposes of NCLB in the absence of the challenged federal regulation. If the federal regulation is invalidated, in other words, California is very likely out of compliance with NCLB. That "change in legal status" significantly increases the likelihood that California will take steps to increase the number of teachers with "preliminary" and "clear" credentials in minority and low-income schools in order to comply with NCLB.

The Secretary makes two arguments against this conclusion. First, he argues that intern teachers are, in fact, already fully certified under California law. In making this argument, the Secretary contends that because California is not a party to this suit we should not interpret California law ourselves, but rather should defer to the Secretary's interpretation. This is a very odd contention. As the Secretary surely knows, we routinely interpret California law in cases in which California is not a party. And while we defer to the Secretary's interpretation of federal law under *Chevron*, we owe no deference to his interpretation of state law.

It is reasonably clear that intern teachers are *not* fully certified under current California law. California's Education

Code distinguishes between holders of intern credentials and holders of preliminary and clear credentials in several ways. For example, § 44300(a)(1)(A) of the Education Code, which governs the hiring of permit holders, requires school districts to document recruitment efforts to hire "certificated teachers, including teacher candidates *pursuing full certification* through internship, district internship, or other alternative routes." (Emphasis added.) That is, while interns are "certificated teachers," they are merely "pursuing full certification." Cal. Educ. Code § 44300(a)(1)(A); *see also id.* § 44225.7(a) (indicating that interns are not "fully prepared" teachers); *Bakersfield Elementary Teachers Ass'n v. Bakersfield City Sch. Dist.*, 145 Cal. App. 4th 1260, 1277 (2006) (referring to credentials other than clear and preliminary as less than "regular").

The 2004 piggybacking California regulations similarly distinguish between intern teachers and fully credentialed teachers. Under the regulation applicable to middle and secondary schools, a teacher is deemed to "meet the requirements of NCLB" under two circumstances. One is that the teacher be "currently enrolled in an approved intern program." The other is that the teacher have "a full credential." Cal. Code Regs. tit. 5, § 6110(2). Thus, as recently as 2004, California confirmed that intern credential holders are not fully certified under the current credentialing system.

Second, the Secretary argues that if the federal regulation is held invalid, California will almost certainly change its credentialing laws to provide that the holder of an intern credential is fully certified under California law. We disagree. As just discussed, California's Education Code indicates that holders of "preliminary" and "clear" credentials have "full certification," but that interns do not. After the passage of NCLB, California made no attempt to change its law to provide that teachers with intern credentials are fully credentialed under California law. Both before and after the promulgation of the challenged federal regulation, California law has char-

acterized intern teachers as not having full credentials. The Secretary points to no evidence indicating that, in the event the federal regulation is held invalid, California will change its credentialing law in a manner it has so far not seen fit to do.

Finally, our dissenting colleague makes an argument not made by the Secretary. He argues that even if the federal regulation is struck down, and even if intern teachers in California are not "highly qualified" within the meaning of NCLB, there is nothing in NCLB that empowers the Secretary to withhold funds as means of compelling a state to adopt a specific system of teacher credentialing. Diss. at 16350 (citing 20 U.S.C. § 7910). But that is not the issue. It is undisputed that NCLB gives the State great flexibility in deciding which teachers are fully certified under state law, and that the Secretary cannot compel a State to adopt any specific credentialing system.

The issue, rather, is whether the Secretary has the authority to withhold funds when a State fails to take steps to ensure that students in minority and low-income schools are not taught disproportionately by teachers without "full State certification" as the state then defines "full certification." That is, a state is free to define "full certification" in any way it chooses. But then, once having defined full certification under state law, the state is required to take steps to ensure that fully certified teachers are proportionately represented in the teaching staffs of minority and low-income schools. It is undisputed that the Secretary has authority to withhold funds if a state does not take such steps. *See* 20 U.S.C. § 1234c (Secretary may withhold funds if a recipient "is failing to comply substantially with any requirement of law applicable to such funds"); *id.* § 6311(b)(8)(C), (g)(2) (Secretary may withhold funds if the State has not submitted a plan describing "specific steps the State educational agency will take to ensure that both schoolwide programs and targeted assistance schools provide instruction by highly qualified instructional staff").

**[7]** The Secretary is not required to withhold funds if a state fails to take steps to come into compliance with NCLB. The statute provides that he "may" do so rather than that he "must" do so. *Id.* §§ 1234c, 6311(g)(2). But the possibility of the Secretary withholding funds is an obvious incentive for a State to comply with NCLB. Further, even if the Secretary does not withhold funds, we are unwilling to assume that California is a scofflaw state. That is, we are unwilling to assume that California will refuse to take steps to come into compliance with NCLB in the absence of such compulsion.

## Conclusion

**[8]** We cannot be absolutely certain how California will respond to the "change in legal status" effected by the invalidation of § 200.56(a)(2)(ii). It is possible, as the Secretary argues, that California will change its credentialing law such that intern teachers will, for the first time, be fully certified under state law. But, as discussed above, the Secretary points to no evidence supporting his contention that California is likely to do so. Indeed, the available evidence suggests precisely the opposite. On the record before us, we conclude that a favorable decision of this court will significantly increase the likelihood of redress of plaintiffs' injuries. *See Utah*, 536 U.S. at 464. That is all that is required by Article III. *See Fed. Election Comm'n*, 524 U.S. at 25. We therefore hold that Appellants have standing under Article III.

We further hold that the definition of a "highly qualified teacher" contained in 34 C.F.R. § 200.56(a)(2)(ii) is invalid because it impermissibly expands the definition in 20 U.S.C. § 7801(23) to include teachers who only "demonstrate[ ] satisfactory progress toward full certification." Our holding does not depend on the meaning of "full State certification" in § 7801(23). We do not address the question whether the Secretary could promulgate a valid regulation providing that an intern teacher meeting certain criteria could have "full State certification" within the meaning of NCLB.

We reverse the district court's grant of summary judgment in favor of the Secretary. We remand for further proceedings consistent with this opinion.

**REVERSED** and **REMANDED**.

---

TALLMAN, Circuit Judge, dissenting:

I respectfully dissent. Appellants—several California public school students, their parents, and two non-profit organizations, including the now-defunct California Association of Community Organizations for Reform Now ("California ACORN")—lack Article III standing because their alleged injury cannot be redressed by a favorable decision from us. I do not disagree with the majority's conclusion that the regulation's phrase, "[d]emonstrates satisfactory progress toward full certification as prescribed by the State," 34 C.F.R. § 200.56(a)(2)(ii)(A)(4), is broader than the statute's phrase, "has obtained full State certification," 20 U.S.C. § 7801(23). But striking down the federal regulation at issue will have no positive practical impact on Appellants' alleged injury because that injury is caused by the actions of a third party not before us—the State of California. Because invalidating the challenged federal regulation will not redress Appellants' alleged injury, I would hold they have no standing to challenge the regulation in the first place. This appeal should be dismissed for that reason.

## I

Appellants argue that the Secretary of Education's ("Secretary's") regulation of the states, in this case California, has harmed them. Under § 702 of the Administrative Procedure Act ("APA"), "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is enti-

tled to judicial review thereof." 5 U.S.C. § 702. "To establish standing to sue under the APA, appellants must first meet the 'irreducible constitutional minimum of standing [which] contains three elements: (1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury.' " *DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1038 (9th Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Appellants, as the parties "invoking federal jurisdiction[,] bear[ ] the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

While Appellants may be able to establish an injury in fact, they can neither establish causation nor a likelihood that a favorable decision will redress their injury.

## II

Appellants have struggled to define their injury in fact. The majority characterizes Appellants' injury as a "poorer quality education" that results from a disproportionate number of interns being assigned to California public schools that serve minority and low-income students. Maj. Op. at 16335. This characterization seemingly contains two injuries. One injury is a poorer quality education itself. Another injury is the disproportionate number of intern teachers hired in these schools. Of course, Appellants argue that the latter causes the former. It follows then, that what Appellants *really* want is quite understandable—a better quality education.

But as the author of the majority opinion once wrote, "The critical question is not what [a plaintiff] 'really' want[s]." William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 242 (1988). Rather, as my colleague there argued, courts should "look[ ] to the underlying 'relevant' statute to determine whether the would-be plaintiff has standing." *Id.* at 264-65; *see also Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) (citing the same article for the same proposition). Thus, the argument must be

that because NCLB entitles Appellants to the same proportion of highly qualified teachers to non-highly qualified teachers as students in affluent areas, the deprivation of that entitlement constitutes their alleged real and immediate injury.

The majority nevertheless characterizes Appellants' injury in fact by what they "really" want—an improvement in their "poorer quality education." But it is entirely speculative to conclude that striking down the regulation at issue would redress that injury. As amicus Teach for America notes, its teachers were able to fill positions in low-income areas precisely because "schools in disadvantaged areas were far more likely to have had hiring difficulties than schools in other areas." Brief for Amicus Curiae Teach for America, et al. at 27-28 (quoting Richard M. Ingersoll, Center for American Progress, *Why Do High-Poverty Schools Have Difficulty Staffing Their Classrooms with Qualified Teachers?* 5 (Nov. 2004)). Put simply, many "highly qualified teachers" would rather work in affluent area schools than low-income area schools. *See Brian A. Jacob, The Challenges of Staffing Urban Schools with Effective Teachers*, 17 Future of Children 1 (Spring 2007) (noting that 34.7% of central city schools had difficulty hiring a math teacher, compared with only 25.1% of suburban schools).

By removing the Teach for America teachers' "highly qualified" label, Appellants hope to lower the number of Teach for America teachers legally allowed to fill vacant positions in low-income area schools. But were California to carry out Appellants' desired result, Teach for America suggests that disadvantaged schools would not see an increase in the number of teachers with "full State certification" teaching in low-income schools, but rather an endemic increase in vacancies. Faced with a staggering number of vacancies, school districts would be forced to resort to emergency measures, such as hiring short-term or long-term substitute teachers. *See* Brief of Amicus Curiae Teach for America at 29.

Some have argued that students taught inconsistently by substitute teachers do not receive the same quality education as students consistently taught by permanent teachers, regardless of either teacher's certification status. *See* Charles T. Clotfelter, Helen F. Ladd & Jacob L. Vigdor, National Bureau of Economic Research Working Paper No. 13648, *Are Teacher Absences Worth Worrying About in the U.S.?* 26 (Nov. 2007) ("students whose teachers miss more days for sickness score lower on state achievement tests"); *Teacher Absences Hurting Learning*, USA Today, Jan. 18, 2006 (citing University of Washington postdoctoral fellow Raegen Miller for the proposition that as few as ten teacher absences in a year cause significant loss in math achievement). Thus, what little information there is about the potential impact of the majority's decision indicates that it would not redress the majority's characterization of Appellants' alleged injury—a "poorer quality education."

In addition, were Appellants' injury in fact defined as a "poorer quality education," they would have difficulty proving that such an injury is "real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted). It is speculative to conclude that all fully certified teachers provide a higher quality education than all teachers participating in alternative route programs. *Compare* Kati Haycock, Good Teaching Matters: How Well-Qualified Teachers Can Close the Gap 13 (1998) (noting that "[e]ducation courses completed, advanced education degrees, scores on professional knowledge sections of licensing exams, even, interestingly, years of experience . . . [do not] seem to have a clear relationship to student achievement"), *and* Thomas J. Kane, Jonah E. Rockoff & Douglas O. Staiger, *Photo Finish: Certification Doesn't Guarantee a Winner*, Education Next 64 (Winter 2007) (noting that "a teacher's certification status matters little for student learning"), *with* Linda Darling-Hammond, *Access to Quality Teaching: An Analysis of Inequality in California's Public Schools*, 43 Santa Clara L. Rev. 1045, 1051 (2003)

(noting that "[n]ational studies have . . . found that differences in teachers' qualifications—including teachers' general ability, knowledge of subject matter, preparation for teaching, and certification status, which reflects aspects of all of these other indicators—show significant effects on student achievement measured at the state, district, school, and individual student levels") (citation omitted).

Appellants have sued under the APA to enforce the letter of NCLB. In passing NCLB, Congress asked states to develop "plans" to "identify steps" that they will take to ensure that "poor and minority children are not taught at higher rates than other children by inexperienced, unqualified, or out-of-field teachers." 20 U.S.C. § 6311(b)(8)(C). Appellants allege that the federal regulation at issue has injured their right to not be taught by inexperienced teachers at a higher rate than "other children." Their alleged injury should therefore be characterized as a lower proportion of experienced to inexperienced teachers instructing them as opposed to those instructing students in affluent areas. It is this alleged injury—the lower proportion itself—that I would consider as Appellants' "real and immediate" alleged injury under the relevant statute. *Lyons*, 461 U.S. at 102.

The majority reasons that if it strikes down the Secretary's definition of a "highly qualified" teacher, 34 C.F.R. § 200.56(a)(2)(ii)(A)(4), as inconsistent with Congress' definition of a "highly qualified" teacher, 20 U.S.C. § 7801(23), Appellants' alleged injury will be redressed. I cannot agree.

### III

Appellants' alleged injury is caused by a "third party not before the court." *Lujan*, 504 U.S. at 560. If a plaintiff is "an object of the [challenged] action (or forgone action) . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561-62. "When, however,

as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Id.* at 562. As the Supreme Court has stated:

> In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Id.* (internal quotations and citation omitted).

In passing NCLB, Congress defined a "highly qualified" teacher as a teacher with "full State certification." 20 U.S.C. § 7801(23). However, NCLB left the definition of "full State certification" entirely to the states—all of which are third parties not before us. To date, California has not defined "full State certification." What California has done is issue its own regulations interpreting and implementing NCLB. Under California Code of Regulations, title 5, §§ 6101 and 6110, "[a] teacher who meets NCLB requirements" is one who "holds at least a bachelor's degree and is currently enrolled in an approved intern program for less than three years," or has a credential and meets other applicable testing requirements. Cal. Code Regs. tit. 5, §§ 6101(2), 6110(2). Thus, California

considers teachers presently participating in alternative certification programs to be highly qualified for purposes of NCLB.

Appellants' alleged injury is therefore caused by California's credentialing scheme. But California is not—and seemingly could never be—a party to this suit. *See Horne v. Flores*, 129 S. Ct. 2579, 2598 n.6 (2009) ("NCLB does not provide a private right of action. . . . Thus, NCLB is enforceable only by the agency charged with administering it."). As a result, Appellants' injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562.

Because Appellants cannot bring suit against California, they have challenged the Secretary's regulation. To have Article III standing to do so, however, Appellants must prove that their injury is fairly traceable to the challenged regulation. *Lujan*, 504 U.S. at 560. Aside from timing, Appellants present no evidence that California inextricably relied on the Secretary's now-stricken regulation—as opposed to NCLB itself—in adopting its regime.

Therefore, Appellants cannot prove that the Secretary's regulation caused the injury they allege. Instead, Appellants' injury is "the result of . . . [California's] *independent* action . . . [which is] not before the court." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (internal quotations omitted). Because California could have classified non-certified intern teachers as "highly qualified" even in the absence of the federal regulation, Appellants have not demonstrated that they have been injured by the Secretary's action.

## IV

The majority's disposition will not redress Appellants' injury. A plaintiff meets the redressability test if it is "likely"

—not certain—"that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotations omitted); *Bonnichsen v. United States*, 367 F.3d 864, 872 (9th Cir. 2004). While "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision," *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998), a "purely speculative favorable outcome will not suffice," *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1020 (9th Cir. 2002) (internal quotation omitted).

The majority does not strike down California's regulation —the cause of Appellants' alleged injury. Instead, the majority strikes down a federal regulation that is nowhere mentioned in the California regulation. For Appellants' injury to be redressed, California—a third party not before us—will have to do *something*, but Appellants have not met their burden to prove that California would be *coerced* into doing *anything* in response to the majority's holding. *Cf. Bennett*, 520 U.S. at 169.

Appellants argue that a declaration stating that the Secretary's alternative route regulation is "unlawful and void," would likely cause California to cease treating alternative route participants as highly qualified. Both parties agree that whether an alternative route participant holds "full State certification as a teacher (including certification obtained through alternative routes to certification)" is a matter of state law. Thus, redressability turns on whether, absent the regulation, California would continue to consider teachers participating in alternative routes fully certified. But because California is not a party to this suit, we have little reason—beyond speculation—to believe it will change its regulatory scheme in any way as a result of Appellants' victory.

The majority argues that the current California regulations "piggyback" on 34 C.F.R. § 200.56(a)(2)(ii), and if that section is struck down, "California [will be] very likely out of

compliance with NCLB" and will therefore be forced to amend its credentialing scheme. Maj. Op. at 16337. I disagree. The very language of California Code of Regulations, title 5, §§ 6101 and 6110 indicates that a teacher who holds a bachelor's degree and who is enrolled in an approved intern program "meets NCLB requirements," not the requirements of the Secretary's regulations. Even assuming that §§ 6101 and 6110 were enacted to conform to both 34 C.F.R. § 200.56 and NCLB itself, there is nothing in §§ 6101 and 6110 that ties their validity to that of § 200.56. The "Reference" section in the notes to §§ 6101 and 6110 includes a citation to NCLB's statutory definition of "highly qualified," 20 U.S.C. § 7801(23), but does not reference the Secretary's definition in § 200.56. Indeed, § 200.56 is not mentioned in either § 6101 or § 6110, even though these sections were enacted after § 200.56. Finally, the "Authority cited" for §§ 6101 and 6110 is California Education Code § 12001, which gives the State Board of Education authority to "adopt rules and regulations for the allocation of federal funds," but nowhere requires it to conform these "rules and regulations" to federal regulations. Cal. Educ. Code § 12001.

Appellants argue that because California allegedly changed its laws to comply with NCLB and its implementing regulations once before, it will do so again if the Secretary's implementing regulation is revoked. But Appellants fail to cite any other evidence indicating that revocation of the Secretary's regulation would have a coercive effect upon California. It is not just that California could change its state law definition of "full credential" to include alternative route participants. California could instead decide to keep its regulatory scheme in its currently ambiguous state. The majority admits as much. *See* Maj. Op. at 16339 (noting there is "no evidence indicating that, in the event the federal regulation is held invalid, California will change its credentialing law"). Even with the federal regulation stricken, the existing California regulations would continue to credit an intern as "[a] teacher who meets

NCLB requirements." Cal. Code Regs. tit. 5, §§ 6101(2), 6110(2).

The majority also overestimates the coercive power that the Secretary has over California, citing 20 U.S.C. § 1234c for the proposition that the Secretary "may withhold funds or take other enforcement action if a state fails to comply substantially with NCLB's requirements." Maj. Op. at 16323. Contrary to the majority's conclusion, Congress has made it clear that the Secretary may not tie federal funding specifically to certification standards. *See* 20 U.S.C. § 7910(b) ("The Secretary is prohibited from withholding funds from any State educational agency or local educational agency if the State educational agency or local educational agency fails to adopt a specific method of teacher or paraprofessional certification."); *id.* § 7910(a) ("[N]o funds available to the Department or otherwise available under this chapter may be used for any purpose relating to a mandatory nationwide test or certification of teachers or education paraprofessionals."). This specific prohibition on withholding funds based on the "certification of teachers" must trump the Secretary's general power to withhold funds for "failing to comply substantially" with NCLB. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general.").

The majority attempts to circumvent this argument by stating that the question in this case is not whether the Secretary has the authority to dictate how teachers are certified, but rather, "whether the Secretary has the authority to withhold funds when a State fails to take steps to ensure that students in minority and low-income schools are not taught disproportionately by teachers without 'full State certification' as the state then defines 'full certification.' " Maj. Op. at 16339. This is a distinction without a difference. Were the Secretary to withhold desperately needed funds from California based on the majority's interpretation of California's certification process, the Secretary would in effect be imposing on Califor-

nia a federal interpretation of California's own law. Under 20 U.S.C. § 7910(b), the Secretary cannot use the power of the federal purse to compel California to adopt a given standard to determine who is fully *State* certified, but that is precisely what the majority's decision attempts to force the Secretary to do.

In enacting NCLB, Congress merely required the states to adopt a "plan" that describes

> the specific steps the State educational agency will take to ensure that both schoolwide programs and targeted assistance schools provide instruction by highly qualified teachers as required by sections 6314(b)(1)(C) and 6315(c)(1)(E) of this title, including steps that the state educational agency will take to ensure that poor and minority children are not taught at higher rates than other children by inexperienced, unqualified, or out-of-field teachers, and the measures that the State educational agency will use to evaluate and publicly report the progress of the State educational agency with respect to such steps.

20 U.S.C. § 6311(b)(8)(C). Moreover, 34 C.F.R. § 200.57, the regulation relating to teacher quality, does not require states to *force* teachers to work at a particular school. Nor does it even require that a balance exist in practice. What § 200.57 does require is that states "establish annual measurable objectives" and describe the steps and strategies the state will use to ensure teacher parity. 34 C.F.R. § 200.57(a)(2). The regulation also requires school districts to develop a plan to ensure that

> [t]hrough incentives for voluntary transfers, professional development, recruitment programs, or other effective strategies, minority students and students from low-income families are not taught at higher

rates than other students by unqualified, out-of-field, or inexperienced teachers.

*Id.* § 200.57(b)(2).

These minimal requirements highlight why Appellants' injuries are not redressable. The majority repeatedly assumes that the State of California can simply assign or redistribute highly qualified teachers. These teachers are human beings. They are not pawns on a chess board that can be redistributed at will. Even in the absence of the regulation the majority strikes down, there is no requirement that California reconsider any such teacher allocations, only that it "establish annual measurable objectives," 34 C.F.R. § 200.57(a)(2), develop a plan with "incentives for voluntary transfers," *id.* § 200.57(b)(2), and "report [on its] progress," 20 U.S.C. § 6311(b)(8)(C).

In short, the majority may strike down a portion of 34 C.F.R. § 200.56, but its disposition cannot *compel* California to entice better teachers to work in low-income areas. There is simply no basis in the record to believe that California will adopt incentive programs to encourage the voluntary transfer of fully State certified teachers—whoever they may be—as the result of the majority's disposition. Given California's current budget woes, that result is speculative indeed. Even if California had the practical means to enact such incentive programs for each locally-controlled school district, the decision to do so lies squarely within the kind of "broad and legitimate discretion the courts cannot presume either to control or to predict," *Lujan*, 504 U.S. at 562, and as a result, Plaintiffs do not have standing.

The majority nevertheless holds that California is likely to change its current policies and attempt to redistribute its fully State certified teachers by creating new incentive programs out of fear of being labeled a "scofflaw" and that there is therefore a significant likelihood that Appellants' injuries will

be redressed. Maj. Op. at 16339. But this argument again boils down to how "fully State certified" is defined—a question that has left us grappling with California's ambiguous certification scheme without the benefit of California's input. Despite the fact that California is not a party to this suit and we are bereft of the State's own interpretation of its certification scheme, the majority has proceeded to adopt a definition of "fully State certified" that excludes interns. While the majority's analysis on the subject is thorough, I think it unlikely that California "would feel compelled to accede to the legal view of a . . . court expressed in a case to which it was not a party." *Lujan*, 504 U.S. at 571 n.5 (Scalia, J., concurring).

Accordingly, Appellants have failed to meet their burden of establishing redressability.

## V

Appellants cannot establish the requirements of causation or redressability necessary to confer Article III standing under *Lujan*. We should hold they have no standing and direct dismissal of the case.